## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALEXANDR DVORNIKOV, | ) | |
| ANTONIO CARDONA, | ) | |
| JOSEPH McPHERSON, and | ) | |
| JOSEPH QUINN, | ) | |
| on behalf of themselves | ) | |
| and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. |
| | ) | 1:15-cv-13286-ADB |
| v. | ) | |
| | ) | |
| LANDRY'S, INC. and CHLN, INC. | ) | |
| d/b/a CHART HOUSE BOSTON, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' ASSENTED-TO MOTION FOR FINAL CLASS SETTLEMENT APPROVAL AND MEMORANDUM IN SUPPORT THEREOF

After years of litigation, the parties in this matter have reached a compromise to settle their dispute on a class basis. The Court preliminarily approved that settlement at a hearing on August 15, 2018. Now – with the notice process complete – Plaintiffs respectfully request that the Court grant final approval of the settlement pursuant to Fed. R. Civ. P. 23(e). Plaintiffs submit such approval is well warranted because the parties' settlement is fair, reasonable, and adequate. It was reached only after the parties had completed extensive merits and classwide discovery, briefing on summary judgment and class certification, and a full-day mediation plus follow-up negotiations facilitated by an experienced third-party mediator. The settlement affords the claiming class members significant monetary recovery – indeed, the majority of claiming class

1

members will be receiving thousands (and in some cases, tens of thousands) of dollars in resolution of their claims.  Lastly, both the proposed incentive payments and the one-third allocation for attorneys' fees and costs are fair, reasonable, and supported by applicable precedent.  Plaintiffs thus ask that this Court grant final approval of this settlement and dismiss this case with prejudice.  A proposed order is attached as "Exhibit 4."

## Background

**1.      Procedural background.**

This is a certified class action involving claims under the Massachusetts Tips Act, M.G.L. c. 149, § 152A, and the Massachusetts Minimum Wage Law, M.G.L. c. 151, §§ 1 and 7.  Specifically, Plaintiffs claimed that Defendants violated the Tips Act by requiring wait staff employees at the Chart House restaurant in Boston to participate in a tip sharing program with employees working as hosts, whom Plaintiffs claimed were not eligible to participate in the tip sharing program.  As a result of this alleged violation, Plaintiffs also claimed that Defendants had violated the Minimum Wage Law by failing to pay the wait staff employees the full minimum wage.  For their part, Defendants argued that the hosts regularly provided direct service to patrons, including delivering food and beverages and clearing tables.  Defendants therefore claimed that the hosts were entitled to receive tips under the Tips Act.

The case was litigated extensively.  After discovery, Defendants moved for summary judgment, and Plaintiffs moved for class certification.  Ultimately, the Court found disputes of material fact existed and denied summary judgment.  See Dvornikov

v. Landry's, Inc., 2017 WL 1217110, at *6 (D. Mass. Mar. 31, 2017).  On class certification, the Court certified a class comprised of all individuals who worked as servers at the Chart House in Boston, Massachusetts, at any time from June 25, 2012 to July 1, 2015, and who remitted any portion of their tips to hosts through Defendants' tip share program.  See id. at *11.

Following those decisions, Defendants filed a motion for reconsideration, which the Court denied.  The parties then engaged in additional limited class discovery.  They also participated in a full-day mediation facilitated by an experienced, third-party mediator.  As a result of that mediation and extensive follow-up negotiations – and with trial scheduled to start in September 2018 – the parties reached an agreement to resolve this case for the total sum of $1,000,000.[1]  The Court granted preliminary approval of that settlement on August 15, 2018.  See docket no. 79.  The parties then retained a third-party administrator – Optime Administration LLC ("Optime") – to issue notice to the class members and to appropriate state officials pursuant to 28 U.S.C. § 1715.

**2.      Overview of settlement terms.**

The parties have agreed to settle this case for the total sum of $1,000,000 on behalf of all individuals who have worked as servers at the Chart House in Boston, Massachusetts, at any time between June 25, 2012 to July 1, 2015, and who have remitted any portion of their tips to hosts through Defendants' tip share program. From that amount, the parties propose to allocate one-third for attorneys' fees and costs

---

[1] The terms of the parties' settlement are set forth in the agreement attached as "Exhibit 1."

($333,333) and $40,000 as incentive awards to the named plaintiffs (each of the four plaintiffs would receive $10,000).[2]  The remainder of the settlement fund – $626,667 – will be distributed to claiming class members, who will receive payments based on their potential damages in proportion to the potential damages for the entire class, up to an amount equal to three times their estimated single damages.  This cap on recovery is based on the fact that Massachusetts law provides for mandatory trebling of wage damages, see M.G.L. c. 149, § 150 and M.G.L. c. 151, § 20, so the most any class member could possibly recover were this case to proceed to judgment would be three times their single damages.  All unclaimed funds will be redistributed to claiming settlement class members on a pro rata basis (again, up to an amount equal to three times their potential single damages).  No portion of the settlement fund will revert to Defendants.  Any residual amounts remaining 180 days after total distribution of the settlement fund will be donated to the Houston Children's Charity, a 501(c)(3) charitable organization selected by Defendants.

Defendants will pay the settlement fund on January 7, 2019, or 30 days after final approval by the Court, whichever date is later.  Individual payments to claiming class members will be paid out one-third as wages with regular payroll tax withholdings, and two-thirds as non-wage, 1099 income, representing alleged liquidated damages under M.G.L. c. 149, § 150 and M.G.L. c. 151, § 20.  This proposed allocation is appropriate under the IRS' long-standing treatment of liquidated damages in wage settlements.  See "Lawsuits, Awards, and Settlements Audit Technique Guide," ch. 3

---

[2] Defendants are separately paying the costs of settlement administration.

("Liquidated damages awarded under a Fair Labor Standards Act of 1938 (FLSA) settlement are not wages for federal employment tax purposes); available at http://www.irs.gov/ Businesses/Small-Businesses-&-Self-Employed/Lawsuits-Awards-and-Settlements-Audit-Techniques-Guide (citing Rev. Rul. 72-268); see also Rev. Rul. 72-268 ("Since payments representing liquidated damages made by an employer to his employees pursuant to 29 U.S.C. 216(b) are not remuneration for employment, it is further held that they are not 'wages' for Federal employment tax purposes, including income tax withholding.  However, such amounts are income to the employees and must be included in their Federal income tax returns").

**3.   Results of the notice process.**

Optime issued notice by first-class mail to the last known addresses of all settlement class members, based on information supplied by Defendants.  See Simpson Declaration at ¶ 4, attached as "Exhibit 2."  The class members had 60 days to submit claim forms, to opt out, or to object to the settlement.  As of the date of this filing, 59 out of 241 class members have submitted claim forms.  Id. at ¶ 7.  No class member has opted out and no one has submitted an objection.  Id. at ¶ 8.  In addition, 83 notices were returned as undeliverable.  Id. at ¶ 5.  Of those, Optime was able to reissue notice to addresses for 22 class members, and re-issued notice to those individuals at their new addresses.  Id.  Further, Plaintiffs' counsel emailed the settlement notice to all class members for whom they had email addresses and called all class members for whom they had telephone numbers.  They also independently attempted to contact non-responsive class members for whom Optime could not obtain updated addresses using

various online tools such as LinkedIn, Facebook, and Intelius.  Through these efforts, counsel was able to provide notice about the settlement to another 18 class members.  Thus, the parties were able to provide notice of this settlement in some form to 199 out of 241 class members.[3]

The estimated value of the 59 class members' claims constitutes approximately 42 percent the available settlement funds.  However, as discussed above, all unclaimed funds will be redistributed to the claiming class members using the same proportional formula, up to an amount equal to three times their potential damages.  Applying this redistribution procedure, 100 percent of the settlement fund is will be disbursed to the claiming class members, which will result in each settlement class member receiving payments equal to approximately 138 percent of their potential single damages.

<u>Argument</u>

**1.    The notice process was fair, reasonable, and adequate.**

Rule 23(e)(1) requires notice of a settlement be issued to class members "in a reasonable manner."  "Courts have consistently held that first-class mail addressed to class members' last known address" is sufficient to satisfy this requirement.  2 McLaughlin on Class Actions § 6:17 (10th ed.) (collecting cases).  Likewise, courts have "repeatedly held that neither due process … nor Rule 23(e) mandates that class members <u>receive</u> actual notice in order to be bound by a class action settlement."  <u>Id.</u>

---

[3] In other words, of the 83 class members for whom notice was returned as undeliverable, Optime and Plaintiffs' counsel were together able to obtain updated contact information and provide notice to 41 previously-unreachable class members, such as calling them, reissuing the notice to new mailing addresses, or sending them notice via email.  Thus, it is reasonable to assume that notice reached 199 out of the 241 class members.

(collecting cases) (emphasis original).  Rather, Rule 23(e) requires only the "best notice practicable under the circumstances."  In re Compact Disc Minimum Advertised Price Antitrust Litigation, 216 F.R.D. 197, 218 (D. Me. 2003) (notice by first class mail ordinarily satisfies Rule 23(e)'s notice requirement).

Here, the parties sent notice by first-class mail to the class members' last known addresses, based on employment records maintained by Defendants.  Where notices were returned as undeliverable, the settlement administrator researched new addresses and reissued notice.  Plaintiffs' counsel also attempted to independently notify many class members for whom they had contact information, and researched contact information for unreachable class members using various online resources.  These efforts well satisfy the due process requirements for notice under Rule 23.  See Peters v. National R.R. Passenger Corp., 966 F.2d 1483, 1486 (D.D.C. 1992) ("the proper inquiry is not whether [class member] received the notices but instead whether the method of providing the notices was 'reasonably calculated, under all the circumstances,' to inform him of the pendency of the class action and his right to be excluded from it."), quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314-315 (1950).

Further, and as a result of the parties' efforts, notice may be deemed to have reached 199 out of the 241 class members.  Courts have found comparable notice rates sufficient to satisfy Rule 23(e).  See In re Integra Realty Resources, Inc., 354 F.3d 1246, 1261 (10th Cir. 2004) (approving settlement where 1,455 out of 6,423 claim forms were "not actually received"); Romero v. La Revise Associates, LLC, 58 F. Supp. 3d 411, 419 (S.D.N.Y. 2014) (same, where 69 out of 430 notices were returned as undeliverable).

Similarly, 24 percent of the individuals in the class have submitted claim forms to participate in this settlement; the value of their claims amounts to approximately 42 percent of the net fund.  Those claim rates far exceed the claim rates of settlements approved by courts in other cases.  See Keil v. Lopez, 862 F.3d 685, 702 (8th Cir. 2017) (approving settlement with 3 percent claim rate); Keene v. Coldwater Creek, Inc., 2009 WL 1833992, at *1 (N.D. Cal. June 23, 2009) (approving settlement where 32 percent of class members submitted claim forms, and where the value of claiming class members' claims came to 46 percent of the settlement fund).

In further support of the sufficiency of the notice process in this case is the fact that the parties' settlement is non-reversionary, meaning all unclaimed funds will be paid to claiming class members and no portion of the settlement fund will be returned to Defendants.  Thus, there is no concern that Defendants will avoid paying the full agreed-upon sum because of insufficient notice or due to a low claim rate.  See Keil, 862 F.3d at 702 (approving settlement with 3 percent claim rate where, inter alia, there "was no reversion to Blue Buffalo. Rather, class members who submitted claims received a pro rata increase. Thus, the low claims rate did not reduce the total amount received by the class."); Harris v. Vector Marketing Corp., 2011 WL 4831157, at *5 (N.D. Cal. Oct. 12, 2011) (declining to grant final approval where low claim rate in reversionary, claims-made settlement "all but guaranteed that Vector would pay out substantially less than $13 million to the class").  Accordingly, Plaintiffs submit that their notice to the settlement class complied with Rule 23(e).

3.    **The terms of the settlement are fair, reasonable, and adequate.**

    a.    **The settlement as a whole is fair, reasonable, and adequate.**

Settlement is favored over protracted litigation.  Newberg on Class Actions, §11:41 ("The compromise of complex litigation is encouraged by the courts and favored by public policy"); see also E.E.O.C. v. Astra U.S.A., Inc., 94 F.3d 73 8, 744 (1st Cir. 1996) ("We do not doubt that public policy strongly favors encouraging voluntary settlement" of class action claims.).  The advantages to the parties and the courts are particularly apparent in the compromise of class actions, which are "often complex, drawn out proceedings demanding a large share of finite judicial resources."  Mayfield v. Barr, 985 F.2d 1090, 1092 (D.C. Cir. 1993); see also Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977) ("In the class action context in particular, 'there is an overriding public interest in favor of settlement,' [which] minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources").

Rule 23(e) requires court approval of all class settlements.  See Fed. R. Civ. P. 23(e); Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 617 (1997).  "'Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims.'"  In re Lupron(R) Mktg. & Sales Practices Litigation, 228 F.R.D. 75, 93 (D. Mass. 2005), quoting In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liability Litigation, 55 F.3d 768, 805 (3d Cir. 1995).  The federal courts have discretion in exercising in this duty, though that discretion is "circumscribed by the long-recognized

policy of encouraging settlements." <u>Durrett v. Housing Authority of City of Providence</u>, 896 F.2d 600, 604 (1st Cir. 1990).

A "strong initial presumption" of fairness arises where the parties can show that the "settlement was reached after arms-length negotiations, that the proponents' attorneys have experience in similar cases, that there has been sufficient discovery to enable counsel to act intelligently, and that the number of objectors or their relative interest is small." <u>Rolland v. Cellucci</u>, 191 F.R.D. 3, 6 (D. Mass. 2000). Although "there is no single test in the First Circuit for determining the fairness, reasonableness and adequacy of a proposed class action settlement," <u>In re Relafen Antitrust Litigation</u>, 231 F.R.D. 52, 71-72 (D. Mass. 2005) (internal quotations omitted), courts in Massachusetts generally assess a proposed class settlement based on the following factors:

(1) the complexity, expense, and duration of litigation, if the agreement is denied;

(2) the amount of the proposed settlement compared to the amount at issue;

(3) reaction of the class to the settlement;

(4) the stage of proceedings and the amount of discovery completed;

(5) the plaintiffs' likelihood of success on the merits;

(6) whether the agreement provides benefits which the plaintiffs could not achieve through litigation;

(7) good faith dealings and absence of collusion;

(8) the settlement's terms and conditions.

<u>See</u>, <u>e.g.</u>, <u>Rolland v. Patrick</u>, 562 F. Supp. 2d 176 (D. Mass. 2008); <u>In re Relafen</u>, 231 F.R.D. at 72; <u>In re Lupron(R)</u>, 228 F.R.D. at 93; <u>Celluci</u>, 191 F.R.D. at 8-9; <u>M. Berenson Co. v. Faneuil Hall Marketplace, Inc.</u>, 671 F. Supp. 819, 822-833 (D. Mass. 1987).

Here, each factor favors final approval of the parties' settlement.  First, denying settlement approval would likely result in a length and expensive trial on behalf of the certified class.   That trial would give rise to a number of unsettled legal issues, including (inter alia) how much food and beverage service suffices to qualify an employee as a "wait staff employee" within the meaning of the Tips Act and what categories of damages the class is entitled to recover should they prevail in establishing liability.  Appeals would almost certainly follow the Court's decisions on those legal issues, which would only further prolong the class members' ability to obtain a recovery.

Second, with respect to the amount of the maximum gross settlement amount, Plaintiffs' counsel submit that the value of the settlement is fair and reasonable given the various challenges in the case.  As noted above, the claiming settlement class members are expected to receive approximately 138 percent of their estimated single damages – a fair and reasonable recovery given the intensely disputed nature of these claims, the risks presented by trial, and the potentially significant delay in obtaining recovery.  See In re Lupron, 345 F. Supp. 2d at 138 (finding the proposed settlement warranted preliminary approval because "the proposed settlement amount is sufficiently within the range of reasonableness").

Third, the reaction of the settlement class has been positive.  As noted, no class member has objected to or opted out of the settlement.  The lack of objections strongly suggests that the proposed settlement is fair, reasonable, and adequate.  See Giusti-Bravo v. United States Veterans Admin., 853 F. Supp. 34, 40 (D.P.R. 1993) ("Another

indication of the fairness of a class action settlement is the lack of, or small number of, objections.").  So, too, does the lack of opt-outs, given that the "claims here are not small-dollar recoveries like in many consumer class actions and because both state and federal law allow a successful plaintiff on these wage-and-hour claims to recover attorney fees and costs."  Scovil v. FedEx Ground Package System, Inc., 2014 WL 1057079, at *4 (D. Me. Mar. 14, 2014).  In other words, the fact that no class members have elected to exclude themselves from this settlement – notwithstanding the potentially significant value of their claims and their right to recover attorneys' fees – suggests their satisfaction with the settlement.

Fourth, and as the Court is well aware, this case was exhaustively litigated.  Full discovery had been completed, substantive motion practice had occurred and been addressed by the Court, and trial had been scheduled for September.  Counsel for the parties were extremely familiar with the facts of the case and, based on this extensive litigation history, were able to reach a comprehensive understanding of the potential strengths and weaknesses of their case.  Their settlement is a direct result of that understanding.

Fifth, Plaintiffs believe that they had a substantial likelihood of success on the merits given their prior experience litigating cases pertaining to the sharing of tips by servers with other employees in the restaurant setting.  However, the outcome of trials are always unknowable and uncertain, and Plaintiffs' counsel were cognizant that Defendants intended to vigorously defend these claims, including potentially appealing the Court's order denying summary judgment and granting class certification.  Thus,

while Plaintiffs believe that their claims were strongly meritorious, they also recognize that they were not without significant risk.

Sixth, the proposed settlement would provide the claiming class members with appreciable monetary sums, while avoiding the risk, expense, and delay of a trial and potential appeals.  This has real value, since – as discussed above – there was always the chance that Plaintiffs would not prevail at trial, which would result in the class receiving nothing.  Instead, as a result of this agreement, the claiming settlement class members will receive more than their single damages in compensation for their claims.

Seventh, the proposed settlement was reached in good faith, after extensive arm's length negotiations, without any collusion between the parties.  As already discussed, the parties were only able to achieve this settlement after retaining an independent mediator, participating in a full-day mediation, and thereafter negotiating independently for several months.  Both parties are represented by counsel who are experienced in wage and hour matters, including, specifically, cases involving allegations of improper tip sharing in the restaurant industry.  In particular, Plaintiffs' counsel in this matter have successfully litigated and resolved dozens of cases involving claims under the Massachusetts Tips Law.[4]  See Overka v. American Airlines, Inc., 265 F.R.D. 14, 19 (D. Mass. 2010) (referring to the undersigned counsel as "well qualified

---

[4] See, e.g., Rodrigues v. Del Frisco's of Boston, LLC, Case No. 15-13958; Cormier, 2015 WL 12732419; Tigges v. AM Pizza, Inc., Case No. 1:16-cv-10136; Matamoros v. Starbucks Corp., Case No. 1:08-cv-10772; Rosano v. TPG Hospitality, Inc., Norfolk Civ. A. No. 15-01176; Reynolds v. Oznemoc, Inc., d/b/a/ Centerfolds of Boston, Suffolk Civil Action No. 2010-2003; Oyola v. Idexx Laboratories, Inc., Worcester Civil Action No. 2010-01023; DiIorio v. The Ritz-Carlton Hotel Company, LLC and IHMS (Boston) LLC, Suffolk Civil Action No. 07-00131; Godt v. Anthony's Pier Four, Inc., BLS Suffolk Civ. A. No. 07-3919; Williams v. Hard Rock Café International, Inc., Suffolk Civ. A. No. 08-1783.

and experienced in class actions on behalf of employees in the service industry"); Dvornikov, 2017 WL 1217110, at *10 ("the Court finds the second part of the adequacy requirement easily met because [the undersigned] counsel is clearly qualified, experienced, and able to undertake this litigation," which concerned claims of improper tip sharing). Plaintiffs' counsel take very seriously their ethical obligations when it comes to resolving wage disputes on a class basis. They would never agree to a proposed settlement that they did not genuinely believe was a fair and reasonable result for the putative class.

Eighth, and finally, the terms of the proposed settlement are within the range of reasonable settlements that courts have consistently approved. The settlement creates a common fund for the payment of all claims on a basis that is proportional to the class members' damages. Courts have deemed settlements adopting similar terms as fair and reasonable. See, e.g., In re Relafen, 231 F.R.D. at 65-66, 71-72; Bezdek v. Vibram USA Inc., 79 F. Supp. 3d 324, 333-335 (D. Mass. 2015). Accordingly, Plaintiffs respectfully submit that the parties' proposed settlement is, on the whole, fair, reasonable, and adequate.

**b.    The settlement's provision for incentive awards is fair and reasonable.**

The proposed settlement also provides that the four named plaintiffs will receive an incentive award of $10,000 each ($40,000 total) in addition to whatever sum they may recover from the gross settlement fund. For three reasons, those awards are fair and reasonable, and should be approved. First, this case would have been impossible without the named plaintiffs, who participated in discovery, were deposed at length,

participated in the mediation, and actively assisted counsel throughout the litigation.

See In re Relafen, 231 F.R.D. at 82 (awarding incentive payments of between $9,000 and

$18,000 to named plaintiffs; "[i]ncentive awards are recognized as serving an important

function in promoting class action settlements, particularly [where] … the named

plaintiffs participated actively in the litigation"); In re Compact Disc Minimum

Advertised Price Antitrust Litigation, 292 F. Supp. 2d 184, 189 (D. Mass. 2003) ("Because

a named plaintiff is an essential ingredient of any class action, an incentive award can

be appropriate to encourage or induce an individual to participate in the suit").

Second, the proposed incentive awards are comparable to incentive awards that

other courts have approved in similar class action settlements involving improper tip

sharing.  See, e.g., Cormier, Case No. 1:13-cv-11822, docket no. 138 (incentive awards of

$7,500 to each named plaintiff); Lisandro v. Domino's Pizza, Inc., Case No. 1:15-cv-

11584 (incentive awards of $10,000 to each of four named plaintiffs); Castagna v.

Madison Square Garden, L.P., 2011 WL 2208614, at *8 (S.D.N.Y. June 7, 2011) (awarding

incentive payments of $10,000 and $15,000 each to named plaintiffs in wage class

action); Godshall v. Franklin Mint Co., 2004 WL 2745890, at *6 (E.D. Pa. Dec. 1, 2004)

(awarding $20,000 incentive awards to each of two named plaintiffs in wage class

action).

Third, incentive awards serve an important role in employment class actions.

The plaintiffs put their names and reputations on the line for their coworkers in

bringing this lawsuit, an act not without potential consequence.  As one court has

observed: "[incentive] awards are particularly appropriate in the employment context

[where] the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers." Frank v. Eastman Kodak Co., 228 F.R.D. 174, 187 (W.D.N.Y. 2005); see also Overka, 265 F.R.D. at 24 ("Courts have considered risk of reprisal by an employer as weighing in favor of [class] certification"); Perez v. Safety-Kleen Systems, Inc., 253 F.R.D. 508, 520 (N.D. Cal. 2008) (concluding class action was superior because "some class members may fear reprisal"); Kieley v. TripAdvisor, LLC, Case No. 08-11284, docket no. 52 at ¶ 19 (approving incentive awards of $5,000 and $10,000 to lead plaintiffs to "compensate them for their unique services in initiating and maintaining this litigation"). Accordingly, Plaintiffs submit that their proposed allocation for incentive awards is fair and reasonable.

### c.    The proposed allocation for attorneys' fees is fair and reasonable.

The parties' agreement provides that Plaintiffs' counsel may recover up to one-third of the common fund (i.e. $333,333) in compensation for their fees and costs.  This proposed allocation is fair and reasonable and should be approved by the Court.

Federal courts in Massachusetts have consistently approved a one-third allocation of attorneys' fees in cases involving wage and employment disputes, where the parties have reached a non-reversionary, common fund settlement.  See, e.g., Rodrigues v. Del Frisco's of Boston, LLC, Case No. 1:15-cv-13958, docket no. 58; Cormier, Case No. 1:13-cv-11822, docket no. 138; Matamoros v. Starbucks Corp., Case No. 08-10772, docket nos. 161, 167, 169; Awuah v. Coverall North America, Inc., Case

No. 07-10287, docket nos. 635, 640 (Young, J.); Sennott v. Gordon Food Service, Inc., Case No. 14-11402, docket no. 76 (Saylor, J.); Hayes v. Aramark, Case No. 08-cv-10700, docket no. 43 (Zobel, J.); Cutter v. HealthMarkets, Inc., Case No. 10-11488, docket nos. 77-80 (Tauro, J.); Keily v. Trip Advisors, LLC, Case No. 08-11284, docket nos. 50, 52-53 (Wolf, J.).

Indeed, a 2010 survey of attorneys' fee awards analyzing class settlements approved by courts in the First Circuit between 1993 and 2002 ultimately found that courts approved wage and employment class settlements with fee provisions in the range of one-third.  See Theodore Eisenberg & Geoffrey P. Miller, Attorneys' Fees & Expenses in Class Action Settlements: 1993–2008, J. of Empirical Legal Stud. 248 (2010). That survey found that in employment class settlements involving fee-shifting statutes (as is the case here), the approved median attorneys' fee award was 37.5 percent, while the mean attorneys' fee award was 31.8 percent, with a standard deviation of 21.7.  See id.  In addition to the data itself, the survey also found "[s]ubstantial empirical evidence … that a one-third fee is a common benchmark in private contingency fee cases," and that "fee requests falling within one standard deviation above or below the mean should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee."  Id. at 8, 38.

Public policy considerations also weigh in favor of the proposed one-third fee award based on the claimed portion of the gross settlement fund.  The proposed award recognizes the vital role that contingency arrangements play in making capable and experience counsel available to individuals who cannot afford hourly fees – which is

essentially everyone who is not independently wealthy.  See, e.g., Beckman v. KeyBank, N.A., 293 F.R.D. 467, 477 (S.D.N.Y. 2013) ("Fee awards in wage and hour cases are meant to 'encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel.'  The FLSA and state wage and hour statutes are remedial statutes, the purposes of which are served by adequately compensating attorneys who protect wage and hour rights"), quoting Sand v. Greenberg, 2010 WL 69359, at *3 (S.D.N.Y. Jan. 7, 2010); In re Giant Interactive Group Inc. Sec. Litigation, 2011 WL 5244707, at *10 (S.D.N.Y. Nov. 2, 2011) ("[T]he Court finds [th]at public policy supports the award of a 33% fee in this case, the better to 'attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so'."), quoting In re WorldCom, Inc. Securities Litigation, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005).

Particularly in the context of employment law, contingency arrangements are a necessity: absent such arrangements, very few workers could afford to pursue legal action against their employers, which would result in less robust enforcement of the wage laws and allow non-compliant employers to avoid liability for their misconduct. As one district court has explained:

> Adequate compensation for attorneys who protect wage and hour rights furthers the remedial purposes of the FLSA. …  Where relatively small claims can only be prosecuted through aggregate litigation, and the law relies on prosecution by "private attorney[s] general," Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 338-39, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), attorneys who fill the private attorney general role must be adequately compensated for their efforts. …  If not, wage and hour abuses would go without remedy because attorneys would be unwilling to take on the risk.

Diaz, 2011 WL 6399468, at *4 (citations omitted).

A one-third fee award also "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." Frank v. Eastman Kodak Co., 228 F.R.D. 174, 188 (W.D.N.Y. 2005) (awarding 40 percent fee). Such an award recognizes that attorneys (like Plaintiffs' counsel) may spend years developing the case law in a particular field and obtaining favorable decisions, all of which contributes to early resolution of later cases. It further recognizes that attorneys who work on a contingency basis incur substantial risk in pursuing class litigation, since such cases can go on for years and can just as likely result in no recovery as they can result in a substantial settlement. See In re Giant Interactive Group, 2011 WL 5244707, at *10 (awarding one-third fee; "plaintiffs' counsel were obligated to assure that sufficient attorney and para-professional resources were dedicated to the prosecution of the action; counsel also faced the responsibility of advancing litigation and overhead expenses on this case for nearly four years").

Finally – and although not required – a lodestar cross-check confirms the propriety of the proposed fee allocation in this matter. See In re Relafen, 231 F.R.D. at 81 ("The First Circuit does not require a court to cross check the percentage of fund against the lodestar in its determination of the reasonableness of the requested fee."). In performing the lodestar cross-check, the Court must first "determine the number of hours reasonably expended" and then multiply that number "by a reasonable hourly rate for attorneys of similar skill within that geographic area." Id. at 77. Here,

Plaintiffs' counsel's lodestar multiplier is well in keeping with those approved by other courts in this Circuit, and is, on its face, fair and reasonable.

Three attorneys represented Plaintiffs in this matter: Hillary Schwab, Brant Casavant, and Rachel Smit.  In sum, those three attorneys spent approximately 187.65 hours litigating this matter, as follows:

| Attorney | Total hours | Hourly rate | Total fees |
|---|---|---|---|
| Hillary Schwab | 52.90 | $600 | $31,740 |
| Brant Casavant | 76.40 | $500 | $38,200 |
| Rachel Smit | 58.35 | $350 | $20,422 |
| **Total Fees** | | | $90,362 |

See Declaration of Brant Casavant at ¶ 2, attached as "Exhibit 3."  These hourly rates are consistent with the hourly rates obtained by counsel with comparable experience practicing in this market.[5]  Moreover, these hours do not include time that counsel spent and will continue to spend administering the settlement (e.g., preparing the final settlement approval papers, responding to class member inquiries, calculating the class members' individual awards, locating nonresponsive class members).

---

[5] See, e.g., Commonwealth Care Alliance v. AstraZeneca Pharm., LP, 2013 WL 6268236, at *1–*2 (Mass. Super. Aug. 5, 2013) (approving hourly rates of $590 for a senior partner practicing in Boston). Davis v. Footbridge Engineering Services, LLC, Case No. 09-11133 (D. Mass. Aug. 22, 2011) (approving hourly rate of $650 for plaintiffs' attorney with 12 years experience); Tuli v. Brigham & Women's Hospital, Case No. 07-12338 (D. Mass. June 8, 2009) (approving rates of $570 to $615 for plaintiffs' attorney with 17 years experience, and $410 to $495 for attorney with 4 years experience); Carter v. Newton Hospitality, Inc., Suffolk Case No. 07-3383 (Mass. Super. Aug. 21, 2009) (approving hourly rate of $585 for plaintiffs' attorney with 14 years experience); see also Brandon Gee, "The Going Rate(s)," Massachusetts Lawyers Weekly (Oct. 11, 2013) (in a review of hourly rates across all practice areas in Boston for the year 2012, finding that partners earn, on average, hourly rates of $598 and associates earn an hourly rate of $388), available at https://masslawyersweekly.com/2013/10/11/the-going-rates/.

In addition to these hourly fees, Plaintiffs' counsel expended $8,192 in litigation related costs.  See id. at ¶ 4.  That amount, once combined with their fees, brings the total fees and costs accrued by Plaintiffs' counsel in this case to $98,554.  Dividing the total fees requested as part of this settlement ($333,333) by total fees and costs incurred results in a lodestar multiplier of 3.38.  A 3.38 multiplier is well within the range of reasonable lodestar multipliers approved by courts in this District.  See In re Neurontin Marketing & Sales Practices Litigation, 58 F. Supp. 3d 167, 172 (D. Mass. 2014) (approving a 3.32 to 3.97 lodestar multiplier).  Indeed, it is far lower than multipliers that courts have approved as reasonable in other class settlements, which have ranged from 6 to 8.[6]  Thus, the lodestar cross check confirms the propriety of awarding the proposed fee award in this matter.

**4.      Conclusion.**

For all the reasons set forth above, Plaintiffs respectfully request that the Court grant final approval of the parties' proposed class action settlement, and enter the order attached to this motion as "Exhibit 4."

---

[6] See, e.g., Conley v. Sears, Roebuck & Co., 222 B.R. 181, 187 (D. Mass. 1998) (approving 8.9 lodestar multiplier); New England Carpenters Health Benefits Fund v. First Databank, Inc., 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (approving 8.3 multiplier); Beckman v. KeyBank, N.A. 293 F.R.D. 467, 481-82 (S.D.N.Y. 2013) (approving 6.3 lodestar multiplier; "[c]ourts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers") (collecting cases).

Respectfully submitted,
ALEXANDR DVORNIKOV,
ANTONIO CARDONA,
JOSEPH McPHERSON,
and JOSEPH QUINN,
on behalf of themselves and all others
similarly situated,

By their attorneys,


  /s/ Brant Casavant
Hillary Schwab, BBO #666029
Brant Casavant, BBO #672614
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
Tel.     (617) 607-3260
Fax.     (617) 488-2261
hillary@fairworklaw.com
brant@fairworklaw.com

**Dated:**  November 12, 2018.

## LOCAL RULE 7.1 CERTIFICATION

Plaintiffs' counsel conferred with counsel for Defendants to attempt in good faith to resolve or narrow the issues contained in Plaintiffs' motion and Defendants counsel noted his assent.

**Dated:** November 12, 2018.          /s/ Brant Casavant

                                   Brant Casavant

## CERTIFICATE OF SERVICE

I certify that I caused a true copy of this document to be served by electronic filing on counsel for all parties.

**Dated:** November 12, 2018.          /s/ Brant Casavant

                                   Brant Casavant